Abdullah ALIZAI, Plaintiff,

v.

MVM, INCORPORATED, Defendant.

No. Civ.A. 97–1220–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 15, 1998.

Kenneth Edward Labowitz, Dingman Labowitz, PC, Alexandria, VA, for plaintiff.

Steven W. Ray, Ray & Isler, PC, Vienna, VA, for defendant.

## MEMORANDUM OPINION

CACHERIS, District Judge.

Plaintiff Abdullah Alizai ("Alizai") brought this action for relief under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000(e) et seq. ("Title VII"). Alizai alleges that he was subject to discrimination on the basis of his national origin by his former employer, Defendant MVM, Incorporated ("MVM"). MVM denies that it unlawfully discriminated against Alizai.

This Court conducted a bench trial on May 27 and May 28, 1998. For the reasons set forth below, the Court finds that Alizai demonstrated by a preponderance of the evidence that MVM discriminated against him in violation of Title VII.[1]

## I.

Alizai was born in Kabul, Afghanistan and is a naturalized United States citizen. (Tr., May 27, 1998, pp. 181–82). MVM is a security agency and provided security for three AT & T sites in Fairfax County, Virginia—the Boeing Court building, the Fairfax Square building, and the Tyson's International Plaza Building ("TIP"). (Tr., May 27, 1998, p. 76). These sites support the secured government telephone communications system as well as White House communications. (Tr., May 28, 1998, pp. 76–77). MVM had 419 employees in April, 1995, and it currently has over 1300 employees. (Tr., May 28, 1998, p. 70).

MVM operated as a paramilitary organization with a specific chain of command. (Tr., May 27, 1998, pp. 52–53). Alizai was hired as a security officer by MVM in or around August, 1994, and earned $6.50 an hour. (Def.exs.2–5). Previously, Alizai was a supervisor at Admiral Security ("Admiral"), the agency which provided security for the AT & T sites until it was re-placed by MVM. (Tr., May 27, 1998, p. 185). Alizai had worked for Admiral for over ten years. (Tr., May 27, 1998, p. 184). When MVM obtained the contract with AT & T, an MVM supervisor contacted Alizai and asked him to work for MVM. (Tr., May 27, 1998, p. 185).

Before leaving Admiral, upon the birth of his daughter, Alizai requested a demotion in rank to officer so that he could have a fixed work schedule which would assist him in caring for the infant. (Tr., May 27, 1998, p. 185). Alizai remained an officer when he began work for MVM. (Tr., May 27, 1998, pp. 61–62). Alizai's shift supervisor at MVM was Clarence Lambert, a man whom Alizai supervised at Admiral before Alizai's voluntary demotion. (Tr., May 27, 1998, pp. 53, 58, 61). Alizai and Lambert developed a friendship and occasionally visited each other's homes. (Tr., May 27, 1998, p. 59).

MVM provided security at the Boeing Court building in three shifts: the first lasting from 11 p.m. until 7 a.m., the second from 7 a.m. until 3 p.m., and the third from 3 p.m. until 11 p.m. (Tr., May 28, 1998, pp. 77–78). MVM provided security for the Fairfax Square and TIP sites during the second and third shifts only. (Tr., May 28, 1998, pp. 77–78). For MVM, Alizai worked the three to eleven shift at the TIP site. (Tr., May 27, 1998, pp. 186–87). Alizai had requested this assignment because it would not require him to wait for relief before leaving work. (Tr., May 27, 1998, pp. 186–87).

According to Lambert, Alizai was an exemplary employee at both Admiral and MVM. (Tr., May 27, 1998, pp. 58–59, 86). Prior to the incident which gave rise to

1. MVM has filed a Motion for Sanctions in regards to an unsigned and allegedly false affidavit submitted by Alizai in his Opposition to MVM's Motion for Summary Judgment. MVM's Motion for Summary Judgment was ruled upon by Judge Albert V. Bryan, Jr., who granted the motion in part and denied it in part. Alizai filed a Motion for Reconsideration, but this Court declined to review Judge Bryan's ruling and denied the motion without addressing its merits. (Tr., May 27, 1998, p. 5). Since Judge Bryan addressed the merits of the Motion for Summary Judgment, and because that affidavit might have influenced his decision, MVM's Motion for Sanctions should be presented to Judge Bryan for consideration. Accordingly, this Court declines to rule on the Motion for Sanctions, and MVM may renotice the motion before Judge Bryan.

this action, Alizai received only one negative evaluation at MVM. (Tr., May 27, 1998, pp. 98, 190). In that instance, an inspector wrote a report stating that Alizai was wearing brown shoes in violation of a uniform requirement for black shoes. (Tr., May 27, 1998, pp. 98, 190). John DeGurse, the project manager for the AT & T sites, testified that he received two reports of Alizai wearing brown shoes. (Tr., May 28, 1998, p. 82). However, Lambert testified that he and other employees routinely wore brown shoes and were never cited for it, and that Lambert was even wearing brown shoes when the inspector gave Lambert the report on Alizai. (Tr., May 27, 1998, pp. 98–100).

During Alizai's employment, MVM had a random drug testing policy and procedure, administered by MVM's Human Resources Department. (Tr., May 28, 1998, pp. 22–23; Def. ex. 4). Typically, that department would select an MVM site, print a list of MVM employees working at the site, and select every fourth employee for testing. (Tr., May 28, 1998, p. 23). Human Resources would send a memorandum to the appropriate area manager at MVM's headquarters, and he or she would go to the site and collect the urine samples from the individuals selected. (Tr., May 28, 1998, pp. 23–24; Pl. ex. 16).

However, Lambert and Alizai testified that a different drug testing procedure was applied to Alizai. According to Lambert, on five or six occasions in approximately three months, he arrived at work and found a cup with a small form directing him to collect a urine sample from Alizai. (Tr., May 27, 1998, pp. 89–91, 93–94). On only the first occasion was Lambert directed to collect a urine sample from another individual in addition to Alizai. (Tr., May 27, 1998, p. 89). Each sample was turned over to the site supervisor. (Tr., May 27, 1998, p. 91). Lambert never suspected that Alizai or the other individual tested used drugs. (Tr., May 27, 1998, p. 94).

Alizai also testified that he was asked to provide urine samples on five or six occasions. (Tr., May 27, 1998, p. 194). He and Lambert testified that after several tests, when a new specimen bottle appeared on Lambert's desk, they would joke that MVM "was thirsty again." (Tr., May 27, 1998, pp. 96, 195). Although Alizai became irritated by the tests, he did not believe that they warranted the filing of a grievance, and since he did not use drugs, he felt he had nothing to hide. (Tr., May 27, 1998, pp. 195–96). Neither Lambert nor Alizai received the results of these tests, and MVM's files reflect only a single drug test for Alizai. (Tr., May 27, 1998, pp. 95–96, 195; Tr., May 28, 1998, pp. 24–25). DeGurse, the project manager, testified that he had no knowledge of Alizai being tested for drugs. (Tr., May 28, 1998, p. 84).

Alizai also described a meeting he once had with MVM's president, Dario Marquez, prior to April 27, 1995, the date of the event which led to this lawsuit. (Tr., May 27, 1998, pp. 221–22). According to Alizai, in addition to himself and Marquez, the meeting was attended by Ron Shelden, who was an MVM operations manager and DeGurse's direct supervisor, and approximately seven others. (Tr., May 27, 1998, p. 222; Tr., May 28, 1996, p. 86). During the meeting, Marquez asked the group for suggestions on how to improve performance. (Tr., May 27, 1998, p. 222). Alizai stated that after several individuals spoke, he began to offer his opinion. (Tr., May 27, 1998, p. 222). Alizai testified that after he introduced himself, Marquez loudly told him to "shut up" for no apparent reason. (Tr., May 27, 1998, p. 222).

William Burwell, a former MVM supervisor, testified that he was at the meeting when this incident occurred. (Tr., May 28, 1998, p. 222). He stated that those at the meeting introduced themselves individually, and when Alizai's turn came, he took the opportunity to say more. (Tr., May 28, 1998, pp. 222–23). According to Burwell, Marquez told Alizai that he did not

understand what Alizai was saying, and that he would speak with Alizai later. (Tr., May 28, 1998, p. 223).

Shelden also testified, but he was not asked about the meeting and stated that he does not recall having any contact with Alizai prior to the April 27, 1995 incident. (Tr., May 28, 1998, p. 163). MVM did not call Marquez to rebut Alizai's testimony or give an explanation for his absence, and no other witnesses testified about the meeting.

Although Shelden did not recall meeting Alizai, Alizai testified that they had met previously at the TIP building. (Tr., May 27, 1998, p. 220). According to Alizai, after being introduced by DeGurse, he extended his hand to Shelden, who gave Alizai a harsh look and aggressively walked past him without shaking his hand. (Tr.,

May 27, 1998, p. 221). DeGurse does not recall introducing Alizai to Shelden, nor does he recall Shelden acting discourteously or unfriendly toward any MVM employee. (Tr., May 28, 1998, pp. 85–86).

On April 19, 1995, the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma was bombed.[2] Following the bombing, MVM increased security at the AT & T sites. (Tr., May 28, 1998, p. 86). Specifically, following an instruction from an AT & T official, MVM officers were instructed to search the bags of individuals entering the sites. (Tr., May 27, 1998, pp. 101–02; Tr., May 28, 1998, pp. 86, 183). Normally, MVM did not direct its officers to search other MVM employee's bags. (Tr., May 27, 1998, p. 103; Tr., May 28, 1998, pp. 174–75). However, Lambert testified that DeGurse, his supervisor, instructed him to

---

**2.** The Court takes judicial notice of this fact pursuant to Federal Rule of Evidence 201. However, the Court will not take judicial notice of "the widespread reaction throughout the country in the immediate aftermath of the Oklahoma City Federal building bombing that terrorists of Middle Eastern origin were responsible for the bombing," as Alizai urges. Under Rule 201(b), a judicially noticed fact must be one not subject to reasonable dispute because it is either generally known within the judicial district or is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

In support of his request for judicial notice, Alizai cites several newspaper articles. However, these articles do not demonstrate that the existence of a widespread national reaction that Middle Eastern terrorists bombed the federal building is beyond reasonable dispute. *See* Fed.R.Evid. 201(b); *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir.1997). No evidence indicates that people in the Eastern District of Virginia generally knew of this "widespread reaction", and certainly, a national "reaction" is not capable of accurate and ready determination. While the news media reported examples of numerous people acting on their suspicion of Middle Easterners, no reliable evidence indicates that these reactions were shared by a substantial number of American people. Moreover, within days of the bombing (and before April 27, 1995), news sources stated that authorities were questioning Timothy McVeigh and other non-Middle Easterners about the bombing.

Def.'s Memorandum in Support of Motion in Limine to Exclude Evidence Regarding the Oklahoma City Bombing, ex. 1.

While a particular individual's reaction to the bombing might be relevant to Alizai's claim, an ambiguous "widespread" reaction, if one existed, would have little probative value. More importantly, admitting a widespread reaction as evidence would unfairly prejudice MVM by creating a presumption that its employees subscribed to popular opinion and therefore believed that individuals of Middle Eastern origin bombed the Murrah Building. Consequently, this evidence would be inadmissible under Federal Rule of Evidence 403.

Alizai was permitted to question individuals about their reaction to the bombing. For example, Ronald Shelden, the manager who ultimately decided to terminate Alizai's employment, testified that immediately after learning of the Oklahoma City bombing, he thought foreign terrorists might have been responsible. (Tr., May 28, 1998, pp. 158, 172). In addition, Shelden, an ex-Marine, testified that he remembered the bombing of the Marine barracks in Beirut in.1982. (Tr., May 28, 1998, p. 173). Also, the Court permitted Alizai to ask Shelden whether he knew that persons of Middle Eastern origin were convicted of crimes relating to the bombing of the World Trade Center and conspiracies to bomb the Empire State Building and the Holland and Lincoln Tunnels, and Shelden answered affirmatively. (Tr., May 28, 1998, pp. 173–74).

search the bags of the only two Middle Eastern officers on his shift, Alizai and Zulfigar Choudry. (Tr., May 27, 1998, pp. 105–06). This was the only time Lambert had been instructed to search the bag of an MVM employee. (Tr., May 27, 1998, pp. 106–07).

DeGurse denied giving this instruction to Lambert. (Tr., May 28, 1998, pp. 120–21). However, according to another MVM supervisor, Alexander Johnson, DeGurse ordered bag searches on everyone entering the AT & T sites, including MVM employees. (Tr., May 28, 1998, pp. 183–84). Johnson claims to have searched the bag of Homer Scudder, a former MVM employee who is not of Middle Eastern origin. (Tr., May 28, 1998, p. 184).

According to Lambert, for two or three days after the bombing, he secretly searched Alizai's briefcase when Alizai made his rounds. (Tr., May 27, 1998, p. 107). Lambert never found anything suspicious inside the briefcase. (Tr., May 27, 1998, p. 107).

On one night during this period, Alizai had difficulty opening the combination lock on his briefcase. (Tr., May 27, 1998, p. 200). Alizai explained that the lock could be opened without the correct combination by applying minimal force, but that would displace a pin inside the briefcase. (Tr., May 27, 1998, pp. 200–01). The night Alizai had difficulty opening the briefcase, he noticed that the pin had been displaced. (Tr., May 27, 1998, p. 201). Alizai checked a videotape recorded by a security camera and concluded that Lambert had opened his briefcase. (Tr., May 27, 1998, p. 201). Alizai claimed that this occurred a second time, after which he repositioned a security camera to monitor his briefcase. (Tr., May 27, 1998, pp. 237–38). Alizai watched the videotape and clearly saw Lambert searching his briefcase. (Tr., May 27, 1998, pp. 237–38).

Alizai and Lambert both testified that Alizai confronted Lambert about the searches. (Tr., May 27, 1998, pp. 110–11, 203–04, 238, 240). Alizai could not recall when the confrontation occurred, although Lambert testified that it occurred right after the second or third search. (Tr., May 27, 1998, pp. 110, 203, 238–39). According to Alizai, Lambert became emotional and admitted to searching his briefcase. (Tr., May 27, 1998, pp. 203–04). Lambert stated that after being confronted by Alizai, he told DeGurse that he would no longer search Choudry and Alizai's bags, and he stopped searching the bags. (Tr., May 27, 1998, p. 111).

On April 27, 1995, Alizai and Lambert worked the 3 to 11 p.m. shift as usual. (Tr., May 27, 1998, pp. 117–18, 204). Between 10 and 11 p.m., the supervisor for the following shift, William Burwell, phoned and stated that he would be about an hour late. (Tr., May 27, 1998, p. 121; Tr., May 28, 1998, p. 215). Lambert informed Thurman Cowan, the assistant shift supervisor for the eleven to seven shift, that Burwell would be late, and Lambert planned to stay until Burwell arrived. (Tr., May 27, 1998, p. 123). However, Alizai knew that Lambert was flying to Kentucky the following morning to attend his son's wedding, so Alizai offered to stay. (Tr., May 27, 1998, pp. 123, 205; Tr., May 28, 1998, p. 227). Alizai and Lambert testified that Alizai told Cowan that he could only stay for one hour because he had to pick up his daughter from a babysitter. (Tr., May 27, 1998, pp. 126, 205).

An hour passed and Burwell had not arrived, so Alizai placed a call to Burwell's home. (Tr., May 27, 1998, p. 206; Tr., May 28, 1998, p. 228). Burwell's wife answered and informed Alizai that Burwell had left and should be arriving shortly. (Tr., May 27, 1998, p. 206; Tr., May 28, 1998, p. 228). At 12:30 a.m., Burwell had still not arrived. (Tr., May 27, 1998, p. 206; Tr., May 28, 1998, p. 228).

According to MVM policy, when an officer does not report for duty, his or her supervisor is required to contact individuals on a list to fill that officer's post. (Tr., May 27, 1998, p. 127; Tr., May 28, 1998, p.

175). According to Alizai, around 12:30 a.m. on the night of the incident, he began urging Cowan to call for a replacement because Alizai had to leave to pick up his daughter. (Tr., May 27, 1998, p. 206). Alizai testified that Cowan stated that he understood that Alizai had to leave and told Alizai, "Go ahead, buddy, I've got you covered." (Tr., May 27, 1998, p. 206). Alizai stated that he repeatedly asked Cowan to call somebody, but Alizai left at 1:15 a.m. after Cowan again told Alizai that he had him covered. (Tr., May 27, 1998, p. 207). Burwell had not arrived by the time Alizai left and the post had not been filled. (Tr., May 27, 1998, p. 208). In fact, Burwell never arrived for work that night. (Tr., May 28, 1998, pp. 214, 228).

In contrast to Alizai's and Lambert's testimony, Cowan testified that Alizai never indicated that he could not work Burwell's entire shift until Alizai actually left the site. (Tr., May 28, 1998, p. 229). Cowan testified that he never told Alizai that he could leave, and that he had no authority to allow Alizai to leave an open post. (Tr., May 28, 1998, p. 230). Cowan stated that he told Alizai that Alizai could not leave, but Alizai was frustrated and left anyway. (Tr., May 28, 1998, pp. 229–30). Cowan explained that he did not put any of these details in the shift report he prepared that night because he thought Burwell was still going to arrive for work. (Tr., May 28, 1998, pp. 231–32; Def. ex. 67). However, Cowan prepared an attendance report stating that Burwell did not arrive and listing the individuals Cowan attempted to contact for duty after Alizai left. (Tr., May 28, 1998, pp. 230–31; Def. ex. 20). But because he believed that Burwell would arrive, Cowan violated MVM policy by not contacting the project manager. (Tr., May 28, 1998, pp. 106, 231; Def. ex. 25).

DeGurse arrived for work at 6:45 a.m. after this incident occurred. (Tr., May 28, 1998, p. 94). The official at AT & T who supervised MVM's activities under the contract met DeGurse when he arrived.

(Tr., May 28, 1998, p. 94). The AT & T official was agitated and inquired about the post left open the night before. (Tr., May 28, 1998, pp. 94, 111). Before that, DeGurse had not known about the open post. (Tr., May 28, 1998, p. 94). The open post was a serious concern because AT & T was a rather demanding client which "wanted some answers ... right away", and by leaving a post open, MVM had breached its contract with AT & T. (Tr., May 28, 1998, pp. 26–27, 111, 125, 163).

DeGurse immediately contacted Alexander Johnson, the supervisor for the 7 a.m. to 3 p.m. shift. (Tr., May 28, 1998, p. 94). Johnson confirmed that there was an open post, which Johnson had learned about from Cowan. (Tr., May 28, 1998, pp. 94, 180). DeGurse initially tried to locate Burwell, then he contacted Shelden and informed him of the problem. (Tr., May 28, 1998, p. 95). Shelden came to the AT & T site, and he and DeGurse reviewed the shift reports for the previous night. (Tr., May 28, 1998, p. 97).

After reviewing the reports, DeGurse and Shelden placed a call to Alizai's home by speaker phone. (Tr., May 28, 1998, pp. 97, 152). DeGurse stated that Johnson was with him and Shelden when they placed the call, although Johnson testified that he was not present, and Shelden did not recall Johnson being present. (Tr., May 28, 1998, pp. 97, 164, 182).

According to Alizai, during the telephone call, he explained why he had left work the previous night. (Tr., May 27, 1998, p. 210). He stated that after providing this explanation, Shelden called him a Nazi and told him that he was trying to blame someone else for his problems. (Tr., May 27, 1998, pp. 210–11). Alizai further testified that Shelden stated that he had a baby of his own and that he could afford a babysitter, and then he told Alizai, "If things are tough, why don't you go back to where you come from?" (Tr., May 27, 1998, p. 211). At the end of the conversation, Shelden told Alizai that he was

suspended indefinitely. (Tr., May 27, 1998, pp. 212–13).

According to DeGurse and Shelden, Alizai was belligerent when they spoke to him, and DeGurse stated that Alizai called them Nazis and said they were always picking on him. (Tr., May 28, 1998, pp. 98, 152). DeGurse testified that Alizai ended the conversation, but he and Shelden called him back a few minutes later. (Tr., May 28, 1998, p. 98). Shelden did not recall placing a second call that morning. (Tr., May 28, 1998, p. 152).

According to DeGurse, in the second conversation, he and Shelden told Alizai that he needed to speak with them in person, but Alizai stated that he had contacted a lawyer who advised Alizai not to speak with them. (Tr., May 28, 1998, pp. 98–99). Shelden also recalled telling Alizai to meet with him, although Shelden was not interested in meeting with Alizai at three o'clock that afternoon when Alizai's shift would have begun. (Tr., May 28, 1998, pp. 166–67). Shelden testified that he informed Alizai that Alizai would be suspended until he met with Shelden and provided a written statement. (Tr., May 28, 1998, pp. 152–53, 166, 168–69). DeGurse and Shelden testified that neither of then called Alizai a Nazi or asked him why he did not go back to where he came from. (Tr., May 28, 1998, pp. 99, 159). Moreover, DeGurse stated that even though Alizai speaks with an accent, he did not realize that Alizai has a foreign national origin. (Tr., May 28, 1998, pp. 99, 140–41).

Alizai testified that Shelden never called him again. (Tr., May 27, 1998, pp. 213–14). However, Shelden testified that approximately two weeks after the initial call to Alizai, he phoned Alizai again. (Tr., May 28, 1998, pp. 152, 157). Shelden stated that he contacted Alizai to try to arrange a meeting, but Alizai continued to be uncooperative and indicated that he was recording the conversation. (Tr., May 28, 1998, p. 158).

Shelden claimed that during the conversation, Alizai told Shelden that he had better be careful because Alizai could have his family killed. (Tr., May 28, 1998, p. 158). Shelden claims that during the conversation, he told Alizai that his employment was terminated. (Tr., May 28, 1998, p. 158). Shelden testified that he terminated Alizai either because Alizai had refused to cooperate in the investigation or because Alizai threatened Shelden's family. (Tr., May 28, 1998, p. 158).

Shelden also claimed to have prepared a memorandum for MVM's files regarding Alizai's threat, but no such memorandum is in MVM's files. (Tr., May 28, 1998, pp. 51, 169–70). Shelden stated that the threat did not significantly upset him because he frequently received death threats. (Tr., May 28, 1998, pp. 159, 171). He explained that he did not contact the police because, based on his experience, he felt that the police would not take any action. (Tr., May 28, 1998, p. 171).

During his testimony, Shelden conceded that he testified incorrectly in a deposition when he stated that Alizai made a threat during the first call, when DeGurse was present. (Tr., May 28, 1998, pp. 161–62). Two nights prior to his testimony before this Court, Shelden remembered placing the second call to Alizai. (Tr., May 28, 1998, p. 160).

Several of Alizai's former co-workers testified that Alizai had mentioned that he had the power to have people killed, and that he displayed considerable wealth. (Tr., May 28, 1998, pp. 187–89, 219, 223, 236–37). However, one of these witnesses, William Burwell, stated that he would be surprised if Alizai threatened to kill someone's family. (Tr., May 28, 1998, p. 224). Alizai denied making statements to his co-workers about killing people and denied the accusation that he once had a certified check for $100,000. (Tr., May 28, 1998, pp. 245–46).

Shelden testified that he did not intend to terminate Alizai's employment before that final telephone conversation. (Tr., May 28, 1998, p. 159). According to Shel-

den, if Alizai had met with him and provided a written statement as instructed, Alizai would likely have received only a three-day suspension. (Tr., May 28, 1998, p. 159). DeGurse also stated that if Alizai would have met with Shelden and him, DeGurse would not have recommended anything more severe than a suspension. (Tr., May 28, 1998, pp. 103, 140). DeGurse had the authority to suspend an employee on his own, however, DeGurse did not have the authority to terminate an employee. (Tr., May 27, 1998, p. 317; Tr., May 28, 1998, p. 75).

As a result of the open post, MVM suspended Burwell and Cowan for two days each. (Tr., May 28, 1998, pp. 156, 217, 235; Def. exs. 21, 25). While Burwell served the two-day suspension, Cowan served a suspension for only one day. (Tr., May 28, 1998, pp. 217, 235). DeGurse and Shelden signed Disciplinary Action Reports for Burwell and Cowan. (Tr., May 28, 1998, p. 107; Def. exs. 21, 25). MVM does not have a Disciplinary Action Report regarding Alizai's suspension or termination. (Tr., May 28, 1998, p. 98).

In fact, the only written records MVM possesses regarding Alizai's suspension or termination is a change of status form indicating that Alizai was terminated and a hard copy of an electronic mail message ("e-mail") from DeGurse to John Torrey, an AT & T official who supervised MVM's activities. (Tr., May 27, 1998, pp. 318–19; Tr., May 28, 1998, pp. 49–50, 86). In the e-mail, sent at 12:20 p.m. on April 28, 1995, DeGurse informed Torrey that Alizai had been suspended pending further investigation of the recent incident. (Tr., May 28, 1998, pp. 112–13; Def. ex. 7). DeGurse wanted to assure Torrey that MVM was taking the open post seriously and was "on top of the situation." (Tr., May 28, 1998, p. 113).

DeGurse testified that he filled out the change of status form for Alizai after being contacted by Shelden a week to ten days after the post was left open. (Tr., May 28, 1998, p. 103). According to DeGurse,

Shelden informed him that Alizai threatened Shelden's family and that Alizai's employment was terminated. (Tr., May 28, 1998, pp. 104–05). DeGurse explained that Shelden then instructed him to do a change of status form regarding Alizai, and Shelden told DeGurse to state on the form that Alizai was terminated for abandoning post. (Tr., May 28, 1998, pp. 104–05). DeGurse filled out and signed a change of status form indicating that Alizai's employment was involuntarily terminated. (Def.ex. 8). The form does not contain any reference to Alizai's alleged threat against Shelden, contains no indication of Alizai's failure to meet with Shelden, and states "abandonment of post" as the only reason for Alizai's termination. (Def.ex. 8).

MVM has a written policy regarding disciplinary action. (Tr., May 28, 1998, p. 42; Def. ex. 29). The policy requires each department to keep a written record of discipline. (Def.ex. 29). The policy further states:

> Documentation must be objective, specific, detailed, and chronological. Evaluations must contain statements based on facts. When performance is the issue, statements, places, dates, and time reflecting the problem should be recorded. If possible, actual statements and a description of events leading up to the current situation should be recorded.

(Def.ex. 29).

Shirley Brown–Cuffee, the Director of Human Resources for MVM, testified that from 1992 to 1995, MVM has terminated the employment of approximately nine individuals for abandoning post, including Alizai. (Tr., May 28, 1998, pp. 27–28; Def. exs. 36–48). Of those employees, only Alizai is from the Middle East. (Tr., May 28, 1998, p. 29). However, according to DeGurse, MVM did not automatically terminate an employee for abandoning post. (Tr., May 28, 1998, p. 102).

Alizai denied threatening Shelden or his family. (Tr., May 27, 1998, p. 212; Tr.,

May 28, 1998, p. 245). Alizai stated that except for a personal call from Lambert, no one at MVM contacted him after he was indefinitely suspended by Shelden on the morning after the post was left open. (Tr., May 27, 1998, p. 213; Tr., May 28, 1998, pp. 244–45). Alizai also claimed that he contacted DeGurse after the initial telephone call. (Tr., May 27, 1998, pp. 213–14; 257). According to Alizai, DeGurse told him that Shelden "blew his cork" and that Alizai needed to deal directly with Shelden. (Tr., May 27, 1998, pp. 213–14, 257; Tr., May 28, 1998, p. 250). At trial, Alizai explained that he repeatedly left telephone messages for Shelden with an MVM receptionist, however, neither Shelden nor anyone else at MVM returned his calls. (Tr., May 27, 1998, p. 214). Shelden testified that he was not aware of any efforts by Alizai to contact him. (Tr., May 28, 1998, p. 159). According to Alizai, no one at MVM told him why he had been suspended or that he had been terminated. (Tr., May 27, 1998, p. 216).

Ultimately, Alizai went to MVM's headquarters and returned his uniform and access cards. (Tr., May 27, 1998, pp. 215–16). Alizai explained that he did not want to be responsible for the access cards, and Shelden testified that an employee who is fired must turn in his uniform and access cards to collect his or her final paycheck. (Tr., May 27, 1998, p. 215; Tr., May 28, 1998, p. 172).

Alizai testified that as a result of the stress of this incident, he began grinding his teeth in his sleep and eventually cracked a tooth. (Tr., May 27, 1998, pp. 217–18). In addition, Alizai stated that the grinding is so loud that he and his wife cannot sleep in the same room. (Tr., May 27, 1998, pp. 220, 281). Alizai submitted dental bills totaling $1937.00, expenses he claimed to have incurred as a result of MVM's conduct. (Tr., May 27, 1998, p. 218; Pl. ex. 7). Alizai also testified that he developed severe heartburn and abdominal pain, although he could not afford to consult a physician about these problems.

(Tr., May 27, 1998, pp. 219, 279–80). He stated that he has had difficulty sleeping as a result of the heartburn and because he grinds his teeth. (Tr., May 27, 1998, p. 280).

Alizai testified that he and his family have endured substantial financial suffering following his termination from MVM. (Tr., May 27, 1998, pp. 219–20). He stated that he has had difficulty finding and maintaining work because he cannot afford a reliable car and will not receive a favorable reference from MVM. (Tr., May 27, 1998, pp. 224–25, 271, 274–77). Alizai currently works as a car salesman for Pohanka Acura, and before that he worked for various car dealers, an insurance company, and he delivered newspapers. (Tr., May 27, 1998, pp. 224–25).

Alizai's W–2 statements indicate that before going to work for Pohanka Acura, he earned $3585.37 since his termination from MVM: $1673.02 from Bill Page Honda (Def. ex. 12; Pl. ex. 3); $1162.35 for delivering the Washington Post (Def. ex. 13; Pl. ex. 3; Tr., May 27, 1998, p. 275); and $750.00 from American Income Life Insurance (Def. ex. 14; Pl. ex. 3; Tr., May 27, 1998, p. 274). Alizai began working at Pohanka Acura around February 27, 1998, but he did not know how much he had earned prior to trial. (Tr., May 27, 1998, pp. 226, 277).

Alizai also testified that his financial troubles have significantly damaged his credit history, and he might be facing foreclosure because he has had substantial difficulty making his mortgage payments. (Tr., May 27, 1998, p. 226). Annette Alizai, Plaintiff's wife, testified that their financial difficulties and the possibility of foreclosure have jeopardized her employment with the United States Secret Service because she might lose her required security clearance. (Tr., May 27, 1998, p. 330).

Annette Alizai also testified that after the incident with MVM, her otherwise cheerful husband became extremely depressed and withdrawn. (Tr., May 27,

1998, p. 328). She also stated that because Plaintiff began grinding his teeth, they can no longer sleep in the same room. (Tr., May 27, 1998, p. 329).

## II.

To resolve this action, the Court must judge the credibility of the witnesses. The Court finds that Alizai and Lambert are more credible than Shelden, DeGurse, and other witness called by MVM.

The first significant conflict in testimony concerns the searches of Alizai's and Choudry's bags. Lambert claimed De-Gurse instructed him to do it, but DeGurse denied giving the instruction. The Court finds that Lambert testified truthfully that DeGurse instructed him to search the bags.

The Court bases its finding on a number of factors. First, as MVM argued and its witnesses frequently stated, Alizai and Lambert were friends and knew each other for years. Therefore, Lambert likely did not have any independent motivation to search Alizai's bags. Second, Lambert fought back tears when he testified about betraying Alizai, and the Court does not find that Lambert feigned that emotion or was otherwise insincere in his testimony. Third, the Court finds that DeGurse was not completely truthful when he stated that he did not realize that Alizai has a foreign national origin, as Alizai's first name is Abdullah[3] and he speaks with a very noticeable accent. Also, the Court finds that DeGurse did not testify truthfully on other issues which are discussed below.

The Court also finds that Lambert and Alizai testified truthfully about the events on the night of April 27, 1995. Specifically, Alizai told Cowan that he planned to stay only one hour into Burwell's shift, and Cowan told Alizai that it was fine for Alizai to leave. Cowan admitted that he thought Burwell was going to arrive for work. The Court finds that Cowan thought that Burwell would arrive at any minute, therefore, a post would not be left open for long after Alizai left. When Burwell did not arrive, Cowan had to minimize his own culpability for the open post, so he denied giving Alizai permission to leave.

Most importantly, the Court finds that Alizai never threatened Shelden's family. First, Shelden's memory was very poor regarding the threat, and the testimony he gave at trial contradicted his deposition testimony. Second, if Shelden had been threatened, a written record of the threat would appear in Alizai's file. Indeed, if Alizai was terminated because of. the threat, MVM's own policy demands that a written record be made of the threat. Third, DeGurse testified that he completed a change of status report for Alizai after Shelden informed him of the threat. However, if the threat had actually occurred and if Shelden had told DeGurse about it, the change of status form would certainly list a death threat against a supervisor's family as a reason for termination. Instead, the form lists only abandonment of post.

The Court finds that Alizai attempted to get his job back, but MVM and Shelden ignored his attempts. The story that Alizai refused to contact Shelden, so Shelden contacted him out of the blue two weeks later to meet with him, and then Alizai threatened Shelden's family defies logic. The Court finds that the reason Shelden had difficulty recalling when he placed the call in which the alleged threats were made and whether DeGurse was present for the call is that he fabricated the call.

Undoubtedly, AT & T officials were very concerned and upset when MVM left a post open at one of their facilities administering sensitive government communications systems eight days after the Oklahoma City bombing. Its contract with AT & T was very important to MVM, and a head had to roll so that AT & T would

---

**3.** Although Alizai went by "John" at work, DeGurse, as project manager, would have known that Alizai's actual first name is Abdullah.

know that MVM was on top of things. The head they chose was Alizai's, and they did not choose him merely because he left his post. To the contrary, even Shelden and DeGurse admitted that merely abandoning his post would not have cost Alizai his job. However, MVM did not terminate him because he refused to cooperate in an investigation or because he made threats, since those things never occurred. Rather, MVM terminated Alizai because he is from the Middle East.

The Court finds that Alizai was truthful when he testified that Shelden asked why Alizai did not go back to where he came from if things were too tough. Alizai was a near-perfect employee working in a position beneath his abilities. Despite this, MVM subjected him to numerous purported drug tests and had his briefcase secretly searched. After the Oklahoma City bombing, MVM treated Alizai differently than it treated its non-Middle Eastern employees. MVM's discrimination culminated in Alizai's termination.

### III.

■ Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of that employee's national origin. 42 U.S.C. § 2000e–2(a). The purpose of Title VII is to assure equal employment opportunities and to eliminate discriminatory employment practices which have harmed minority citizens. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Supreme Court set forth a three-step proof scheme under which a plaintiff may prove a Title VII violation. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996).

■ Under the *McDonnell Douglas* scheme, in order to recover under Title VII, a plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089,

67 L.Ed.2d 207 (1981); *Evans,* 80 F.3d at 959 (4th Cir.1996). If a plaintiff does so, the burden then shifts to the defendant to produce and articulate some legitimate, nondiscriminatory reason for taking the allegedly discriminatory action. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Evans,* 80 F.3d at 959 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ If the defendant meets this burden, the presumption of unlawful discrimination created by the *prima facie* case is eliminated, and the plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason is not true and is a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Evans,* 80 F.3d at 959. In regards to this final element of the scheme, a plaintiff must prove that the real reason for the conduct is discrimination. *Vaughan v. Metrahealth Companies, Inc.,* 145 F.3d 197, 201–03 (4th Cir.1998) (citing *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742). The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against him. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Evans,* 80 F.3d at 959.

■ Alizai claims that because of his national origin, MVM disciplined him for abandoning a post more severely than it would have disciplined a non-Middle Eastern employee under the same circumstances. Under the first step in the *McDonnell Douglas* framework, in order to establish a *prima facie* case of national origin discrimination in the enforcement of disciplinary measures, Alizai must show: 1) that he is a member of a class protected by Title VII; 2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and 3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v.*

*CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993).

The parties do not dispute that because Alizai is a native of Afghanistan, he is a member of a protected class on the basis of his national origin. However, there is substantial dispute over the remaining two elements of a *prima facie* case.

MVM argues that because it has terminated eight non-Middle Eastern employees for abandoning post from 1992 to 1995, Alizai cannot demonstrate that MVM enforced more severe disciplinary measures against him. Alizai argues that this evidence has little probative value because it does not account for those employees who abandon post and are not terminated.

The testimony of DeGurse and Shelden, two witnesses called by MVM, belies MVM's argument. DeGurse testified that "We (MVM supervisors) don't automatically terminate somebody simply for abandoning post." (Tr., May 28, 1998, p. 102). DeGurse and Shelden both testified that Alizai would not have been terminated merely for abandoning the post. (Tr., May 28, 1998, pp. 103, 140, 159). No evidence contradicts this testimony.

The clear implication from this testimony is that MVM did not terminate an employee for abandoning a post unless there were aggravating circumstances, or at minimum, no mitigating circumstances. The disciplinary records of the other employees terminated by MVM supports this conclusion. For the reasons previously stated, the Court finds that the aggravating circumstances, namely Alizai's refusal to cooperate and threat to Shelden, did not exist. In addition, as DeGurse acknowledged, there were substantial mitigating circumstances. (Tr., May 28, 1998, pp. 102–03, 140). These circumstances include the facts that Alizai had volunteered to fill the post, Burwell stated that he would be arriving soon, and Alizai had to leave to pick up his infant daughter.

MVM's treatment of Burwell is consistent with this practice. Although Burwell did not "abandon" his post, he failed to report for work, and he did so after calling and stating that he would be there shortly. Even though he could have been terminated, based on mitigating circumstances, Burwell received a two-day suspension, a penalty far less severe than termination. (Pl.ex. 10).

Accordingly, the Court finds that Alizai established a *prima facie* case of discrimination based on national origin. The burden then shifted to MVM to produce and articulate some legitimate, nondiscriminatory reason for terminating Alizai. MVM articulated three non-discriminatory reasons for terminating Alizai's employment: 1) Alizai abandoned his post; 2) Alizai refused to cooperate in the investigation regarding the open post; and 3) Alizai threatened to kill Shelden's family. Thus, having met its obligation, the burden shifted back to Alizai to prove by a preponderance of the evidence that these reasons are false and that discrimination is the true reason MVM terminated his employment.

■ While the first reason, abandonment of post, is the reason provided in Alizai's change of status report, Shelden and DeGurse testified that mere abandonment of post was not the reason Shelden fired Alizai. Therefore, this reason, standing alone, clearly is not true.

The Court also finds that the second reason is false. Alizai testified credibly that he contacted DeGurse about his job, but DeGurse told him that he had to contact Shelden. Alizai made repeated attempts to contact Shelden, but Shelden would not accept or return Alizai's calls. The Court's credibility determination is supported by the fact that Shelden admitted that he was unwilling to meet with Alizai the day after the incident, when Alizai would have reported for work, even though MVM wanted to quickly resolve the problem.

As stated, the Court finds that Alizai never made the threats described by Shel-

den, therefore, the third articulated reason for MVM's conduct is also false.

Finally, the Court finds that Alizai has sufficiently proven that these false reasons are a pretext for discrimination and that the actual reason MVM terminated his employment is unlawful discrimination. Shelden, the supervisor who made the decision to terminate Alizai, first demonstrated his hostility toward Alizai by refusing to shake his hand when they initially met. Alizai had an exemplary record with MVM, and Shelden had no legitimate reason to treat him poorly.

In addition, the repeated drug tests and searches of Alizai's and Choudry's bags around the time of the Oklahoma City bombing demonstrates a discriminatory animus by MVM against Alizai. Credible evidence revealed that with respect to the drug tests and bag searches, Alizai was treated more harshly than his non-Middle Eastern co-workers and in a manner inconsistent with MVM's policies.

Alizai sufficiently demonstrated that had he not been a native of Afghanistan, MVM would not have terminated his employment. Shelden made his motive for terminating Alizai clear when he suspended Alizai indefinitely and, shortly after the Oklahoma City bombing, suggested that Alizai return to Afghanistan. Shelden had no interest in permitting Alizai to return to work, so he resisted Alizai's efforts to contact him. Ultimately, attempting to conceal his unlawful treatment of Alizai, Shelden fabricated a story about Alizai making threats against his family.

### IV.

■ 42 U.S.C. Section 1981a and 42 U.S.C. Sections 2000e–5(g) and (k) provide that a party who brings a successful action for a violation of 42 U.S.C. Section 2000e–2 may recover compensatory and punitive damages as well as reasonable attorney's fees and costs.[4]

First, Alizai is entitled to back pay for the amount of work he missed at MVM after his termination and before his employment with Pohanka Acura, minus the income he received during that time. Alizai made sufficient efforts to find and maintain employment during this time, but his inability to afford a reliable car and his need to care for his daughter hampered those efforts.

Alizai's salary at MVM was $6.50 per hour on April 28, 1995, when his employment was terminated. Alizai began working at Pohanka Acura around February 27, 1998, 112 weeks later. If Alizai had worked at MVM for forty hours per week, fifty weeks per year during that time, he would have earned $27,560.00 ($6.50 × 40 hours × 106 weeks). Alizai actually earned $3585.37 during that time, and the award shall be reduced accordingly. Therefore, Alizai is entitled to $23,974.63 in back pay.

■ Alizai is also entitled to compensation for his mental anguish and his physical and emotional pain and suffering. The Court finds that $30,000.00 is appropriate compensation, plus his dental expenses, $1937.00.

■ 42 U.S.C. Section 1981a(b)(1) permits an award of punitive damages if the complaining party demonstrates that the respondent acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." In order to receive a punitive damages award, a plaintiff generally must make a "heightened showing" of the culpable state of mind of the employer. *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983 (4th Cir. 1997). The Court finds that the facts of

---

**4.** 42 U.S.C.2000e–5(g)(1) states: "If the court finds that the respondent has intentionally engaged in [ ] an unlawful employment practice charged in the complaint, the court may [ ] order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or with out back pay (payable by the employer [ ] responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate." Reinstatement is not appropriate here because Alizai does not wish to return to work for MVM. (Tr., May 28, 1998, p. 269).

this case do not support an award of punitive damages.

However, Alizai is entitled to recover reasonable attorney's fees and costs, plus interest. 42 U.S.C. § 2000e–5(k). He may file a petition for attorney's fees and costs as set forth in the accompanying Order.

In sum, Alizai is entitled to $23,974.63 (back pay), plus $31,937.00 (additional compensatory damages), totaling $51,911.63, plus reasonable attorney's fees, costs, and interest yet to be determined.

## V.

### Conclusions of Law

1. Pursuant to 42 U.S.C. Section 2000e–5(f) and 28 U.S.C. Sections 1331 and 1343(a)(4), this Court has jurisdiction to hear this action brought under Title VII.

2. Plaintiff Alizai has proven his claim of unlawful discrimination by Defendant MVM on the basis of his national origin by a preponderance of the evidence.

3. Defendant MVM has failed to produce a legitimate, nondiscriminatory reason for terminating Plaintiff Alizai's employment.